IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

TYLER DIVISION

| | | |
|---|---|---|
| RANDY CHAPMAN, #582570 | § | |
| VS. | § | CIVIL ACTION NO. 6:08cv81 |
| FNU PACE, ET AL. | § | |

MEMORANDUM OPINION AND
ORDER OF DISMISSAL

Plaintiff Randy Chapman, an inmate previously confined at the Michael Unit of the Texas prison system, proceeding *pro se* and *in forma pauperis*, filed the above-styled and numbered civil rights lawsuit pursuant to 42 U.S.C. § 1983. The complaint was transferred to the undersigned pursuant to 28 U.S.C. § 636(c).

The original complaint was filed on March 10, 2008. The Plaintiff complained about the medical care he had received. On July 31, 2008, the Court conducted an evidentiary hearing, consistent with *Spears v. McCotter*, 766 F.2d 179 (5th Cir. 1985), to consider the Plaintiff's claims. Regional Grievance Coordinator Chip Satterwhite, Warden Eddie Baker and Nurse Kathy Gray attended the hearing in order to answer any questions the Court may have concerning prison policy or information contained in the Plaintiff's records. Only sworn testimony and authenticated records were accepted during the *Spears* hearing, and the evidence submitted by prison personnel was considered by the Court only to the extent that it does not contradict the inherently plausible and credible evidence offered by the Plaintiff. *Vernado v. Collins*, 920 F.2d 320, 321 (5th Cir. 1991). The Plaintiff gave the Court permission to review his prison records.

The Plaintiff was injured in a job related accident that occurred at the Michael Unit on January 21, 2007.  He was standing on a ladder cleaning windows and vents.  A co-worker failed to comply with procedures to hold the ladder.  The ladder fell over, and the Plaintiff landed on it.  His injuries included a fractures to his left forearm and left leg.  More specifically, he received an impact fracture of the left distal radius and a non-displaced spiral fracture of the left tibia.  He was taken to the infirmary by wheelchair.  Nurse McKnight's initial impression was that he looked pretty bad and that he should go to the hospital.  She called security and was told that there were not enough officers working to take him to the hospital.  She left with the officer.  When she returned, she stated that his injuries did not appear that bad and she scheduled him to see the doctor on the following day.

The Plaintiff saw Dr. Thompson on the following day.  He indicated that the Plaintiff should have been taken to the hospital when he first arrived at the infirmary on January 21, 2007.  However, he likewise would not send him to the hospital.  He scheduled the Plaintiff for x-rays.  X-rays were made on the following day.  The aforementioned fractures were first discovered because of the x-rays.  Dr. Thompson placed casts on both the Plaintiff's arm and leg.  He told the Plaintiff that he would see him again in about two weeks.

The Plaintiff was scheduled to be examined by an orthopedic surgeon by telemed on February 14, 2007.  Mrs. Pace, the Michael Unit Medical Administrator, cancelled the exam because of a unit lockdown.  The Plaintiff noted that medical personnel were still going about their duties, and he did not see any reason why the examination had to be cancelled.

Dr. Thompson removed the casts and x-rayed the fractures on March 20, 2007.  The x-rays revealed that the "distal radius had slipped and not healed properly."  Stated differently, the bones in the Plaintiff's forearm were misaligned and healed improperly.  Dr. Thompson had the Plaintiff

sent to Hospital Galveston. On March 27, 2007, the Plaintiff was examined by an orthopaedic surgeon, who decided that surgery was necessary and that it would be performed in a couple of weeks. The surgery would require braking the bones and resetting them. On or about April 24, 2007, the Plaintiff was examined by Dr. Moulton, a surgeon, who advised the Plaintiff against having the surgery. He explained that he could not repair the fracture properly because of the delay. Surgery at that late date would only be cosmetic in nature. Dr. Moulton discussed the risks involved in going ahead with the surgery. Nonetheless, the Plaintiff wanted to proceed with the surgery, which was performed on June 7, 2007. The bones were broken once again, and the surgery involved plates and screws. His forearm was straightened but full function was not restored. Dr. Moulton stated that he would not have had this problem if surgery had been performed right after the incident.

The Plaintiff noted that on May 10, 2007, while he was waiting for the surgery to be performed, P. A. Buchanan lifted his medical restrictions. He was cleared to work in the fields. When he arrived to work in the fields, the officer on duty saw his condition and sent him back inside. He was assigned to the laundry. He had worked there before. The supervisory officer likewise noticed his condition. He called the infirmary and was told that the Plaintiff did not have any medical restrictions. The supervisory officer gave him a job folding clothes and told him to do what he was capable of handling. His arm was reinjured on May 19, 2007. The Plaintiff testified that he sued P. A. Buchanan for lifting his medical restrictions. It is noted that a doctor had issued instructions to have him medically unassigned while awaiting surgery.

The Plaintiff testified that he sued Nurse McKnight for changing her mind about sending him to the hospital. He sued Dr. Thompson for likewise failing to send him to the hospital. He sued Ms. Pace for cancelling his telemed appointment. Also, Major Bowman saw him and observed his

3

injuries and contacted Ms. Pace as to why the Plaintiff's injuries were shown as only minor. Ms. Pace said that she was investigating the matter and that things were under control. The Plaintiff testified that Ms. Pace lied to Major Bowman.

Warden Baker testified under oath that an inmate will not be denied transport to a hospital if it is necessary even though there is a shortage of officers. Security personnel will find a way to transport the inmate to the hospital.

Nurse Grey testified under oath from the Plaintiff's medical records. The records show that the Plaintiff was brought to the infirmary on January 21, 2007. There were no notations about needing to transport the Plaintiff to the hospital. Nurse McKnight gave the Plaintiff ice and crutches and scheduled him to see the doctor on the following day. On January 22, 2007, Dr. Thompson examined the Plaintiff. He noted swelling to the Plaintiff's left leg and arm. His assessment was probable sprain and contusion. He ordered x-rays to rule out the possibility of fractures. He gave the Plaintiff a cell pass, medication and crutches. The x-rays were made on the following day. The x-rays showed an "impact fracture of the left distal radius" and "non-displaced spiral fracture of the left tibia." Dr. Thompson placed casts on both fractures and issued an expedited referral to the Orthopedic Department. Nurse Gray testified that she did not see anything in the records about a telemed examination being scheduled. She added that there were several notes about the Plaintiff being seen at Hospital Galveston. She noted that P. A. Buchanan's instructions on May 10, 2007, were unclear, although she finally concluded that the Plaintiff must have been cleared to go to work because the Plaintiff was instructed to submit a sick call request if he had problems at work.

Chip Satterwhite testified that grievance records reveal that the Plaintiff exhausted his administrative remedies against Nurse McKnight and Dr. Thompson. He filed Step 1 grievances

only with respect to claims against Ms. Pace and P. A. Buchanan.  The Court notes that the Step 1 grievance involving P. A. Buchanan, Grievance No. 2008034460, shows that it was returned to the Plaintiff because the grievable time period had expired.  The Plaintiff did not file a Step 2 grievance.

The Plaintiff gave the Court permission to review his records, including his medical records.  The records concerning the Plaintiff's injuries are extensive.  Nurse McKnight saw the Plaintiff on January 21, 2007, at 11:26 p.m.  She scheduled the Plaintiff to see a doctor in the morning.  An ice pack, acetaminophen and a crutch were provided.  As noted by Nurse Gray, there is no mention by Nurse McKnight concerning sending the Plaintiff to the hospital.  On January 22, 2007, at 8:00 a.m., Dr. Thompson noted that the Plaintiff had fallen off of a ladder on January 21, 2007.  He noted that the Plaintiff's left wrist and leg were swollen and sore.  He specified that there were no obvious fractures.  His impression was sprain and contusion.  He ordered x-rays, gave the Plaintiff a cell pass and crutches, and prescribed Naproxen 500 mg. for ten days.  Dr. Thompson made another entry after the x-rays were made on January 22, 2007.  He noted that he placed a cast on both the Plaintiff's left forearm and left leg.  He referred the Plaintiff to Ortho-Telemed.  On January 30, 2007, restrictions were placed on the Plaintiff's HSM-18, per Dr. Thompson, for a low bunk and low row for three months.  On March 19, 2007, Dr. Thompson noted that he removed the casts.  He observed good motion in the wrist and that the leg looked good.  He ordered x-rays of the fractures.  The x-ray of the Plaintiff's left forearm on March 20, 2007, showed "impacted dorsal angulated comminuted fracture of the distal left radius is again noted with no overall change in appearance of the fragments although some callus formation is seen about the fracture site."  On March 20, 2007, after receiving the results of the x-rays, Dr. Thompson referred the Plaintiff to the Orthopaedic Department because of the misalignment of the left forearm.  He specified that the appointment

5

should be expedited, and he noted that he had made the first referral six weeks earlier. The Plaintiff was seen by Dr. Moulton by telemed on April 24, 2007. Dr. Moulton made an entry in the records noting the malfunction in the left forearm and that the Plaintiff would be brought to Hospital Galveston for surgery. On May 23, 2007, P. A. Buchanan made the confusing entry as to whether the Plaintiff's medically unassigned restriction would be continued, although the entry ended with a note that the Plaintiff was told to send a sick call request to medical for any problems with the work assignment. After the surgery, another x-ray made of the Plaintiff's left forearm on July 12, 2007, showed "a side plate and multiple screws transfixes an ununited displaced and angulated fracture through the distal left radius." The x-ray of the left lower leg revealed that the spiral fracture line was barely perceptible with no specific abnormalities. On July 25, 2007, the sutures were removed without difficulty. On September 24, 2007, an examination revealed that the Plaintiff was still having problems with his left forearm and left leg. A recommendation was made to transfer him to a unit where therapy could be provided. The entry was signed by Nurse Barbara Hughes and P. A. Buchanan. The Plaintiff was assigned to the Estelle Unit on October 25, 2007.

The medical records include several HSM-18s. The first one, dated January 30, 2007, indicated that the Plaintiff was medically unassigned for purposes of work for 90 days. The HSM-18 was signed by Dr. Thompson. The next one in the records was dated June 25, 2007. It listed the Plaintiff as medically unassigned. No time limits were listed. It was signed by P. A. Buchanan. All subsequent HSM-18s specified that the Plaintiff was medically unassigned. The HSM-18 in May, 2007, that the Plaintiff had in his possession at the *Spears* hearing was not in the records.

In reviewing the Plaintiff's claims, the Court initially notes that the Supreme Court has held that many acts that might constitute a violation of state tort law do not amount to constitutional violations. *Baker v. McCollan*, 443 U.S. 137, 146 (1979). *See also Lewis v. Woods*, 848 F.2d 649,

6

651 (5th Cir. 1988). In this Circuit, before a plaintiff may maintain a civil rights suit, he must show an abuse of governmental power that rises to a constitutional level. *Love v. King*, 784 F.2d 708, 712 (5th Cir. 1986); *Williams v. Kelley*, 624 F.2d 695, 697 (5th Cir. 1980), *cert. denied*, 451 U.S. 1019 (1981). He must allege a deprivation of a federally protected right in order to set forth a *prima facie* case. *Maine v. Thiboutot*, 448 U.S. 1 (1980); *Williams v. Treen*, 671 F.2d 892, 900 (5th Cir. 1982).

Deliberate indifference to a prisoner's serious medical needs constitutes an Eighth Amendment violation and states a cause of action under 42 U.S.C. § 1983. *Estelle v. Gamble*, 429 U.S. 97, 105-07 (1976); *Jackson v. Cain*, 864 F.2d 1235, 1244 (5th Cir. 1989). In *Farmer v. Brennan*, 511 U.S. 825, 835 (1994), the Supreme Court noted that deliberate indifference involves more than just mere negligence. The Court concluded that "a prison official cannot be found liable under the Eighth Amendment . . . unless the official knows of and disregards an excessive risk to inmate health or safety; . . . the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. *See also Reeves v. Collins*, 27 F.3d 174, 175 (5th Cir. 1994).

In *Domino v. Texas Department of Criminal Justice*, the Fifth Circuit discussed the high standard involved in showing deliberate indifference as follows:

> Deliberate indifference is an extremely high standard to meet. It is indisputable that an incorrect diagnosis by medical personnel does not suffice to state a claim for deliberate indifference. *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985). Rather, the plaintiff must show that the officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Id.* Furthermore the decision whether to provide additional treatment "is a classic example of a matter for medical judgment." *Estelle*, 429 U.S. at 107. And, the "failure to alleviate a significant risk that [the official] should have perceived, but did not" is insufficient to show deliberate indifference. *Farmer*, 511 U.S. at 838.

7

239 F.3d 752, 756 (5th Cir. 2001). Unsuccessful medical treatment does not give rise to a civil rights action. *Johnson v. Treen*, 759 F.2d at 1238. "A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment." *Estelle v. Gamble*, 429 U.S. at 107. An inadvertent failure to provide adequate medical care or negligence does not violate the Eighth Amendment. *Id.* at 105-06. Allegations of malpractice and negligence does not provide a basis in law for § 1983 suits, and the claims should be dismissed as frivolous. *Graves v. Hampton*, 1 F.3d 315, 319-320 (5th Cir. 1993). *See Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993).

In the present case, the Plaintiff had fractures to his left forearm and left leg at the time he arrived in the infirmary. The complaints raised by the Plaintiff concern the medical care he received. He was seen by Nurse McKnight late at night on January 21, 2007. The Plaintiff noted that her initial impression was that he should be transported to the hospital. Nonetheless, he was not transported to the hospital. Instead, she scheduled him to see the doctor early in the morning. She gave him an ice pack, acetaminophen and a crutch. She was responsive to his needs. She did not ignore him. Perhaps a different course of action could have been followed, but she was not deliberately indifferent.

The Plaintiff was examined by Dr. Thompson early the next morning. Dr. Thompson observed that the Plaintiff's left wrist and leg were swollen and sore. He specified that there were no obvious fractures. His impression was a sprain and contusion. He ordered x-rays, gave the Plaintiff a cell pass and crutches, and prescribed Naproxen 500 mg. for ten days. He recognized that the Plaintiff's injuries were more serious after the results of the x-rays came in. He placed casts on both the Plaintiff's left forearm and left leg. He referred the Plaintiff to Ortho-Telemed. After the casts were removed and the misalignment of the bones in the Plaintiff's left forearm was apparent, Dr. Thompson made an expedited referral to the orthopaedic surgeons at Hospital Galveston. He

also enquired as to why the Plaintiff had not already been seen in light of his earlier referral to them for an examination by telemed. The facts of this case do not support an inference that Dr. Thompson was deliberately indifferent. He was responsive to the Plaintiff's serious medical needs. The Plaintiff does not have a basis for a potentially meritorious civil rights lawsuit because Dr. Thompson did not send him to the hospital on the first occasion that he saw him or had him x-rayed immediately. It appeared to Dr. Thompson that the Plaintiff did not have any fractures and that he had sustained only a sprain and contusion. He took appropriate action when he recognized that the Plaintiff's situation needed additional attention. The facts as alleged and developed at most support a state claim of medical malpractice or negligence, but the facts do not support a federal claim of deliberate indifference.

The facts overall show that medical personnel were responsive to the Plaintiff's serious medical needs. He was provided abundant care. The facts do not support an inference of deliberate indifference. The Fifth Circuit's conclusions in *Mayweather v. Foti*, 958 F.2d 91, 91 (5th Cir. 1992), about the medical care provided for an inmate's back problems are equally applicable in the present case about the Plaintiff's problems with his left forearm and left leg:

> The record shows that he received continuous treatment for his back injury despite his incarceration. The treatment may not have been the best that money could buy, and occasionally, a dose of medication may have been forgotten, but these deficiencies were minimal, they do not show an unreasonable standard of care, and they fall short of establishing deliberate indifference by the prison authorities. Continuing back pain is unpleasant. Its existence does not, however, in and of itself demonstrate that a constitutional violation occurred.

The Plaintiff's claims about the medical care he received fail to state a claim upon which relief may be granted and are frivolous in that they lack any basis in law and fact. The lawsuit should be dismissed pursuant to 28 U.S.C. § 1915A(b)(1).

The Court would note, however, that P. A. Buchanan's decision in May, 2007, lifting the Plaintiff's work restrictions is troubling. Her orders were unclear, as noted by Nurse Gray. P. A. Buchanan's actions show some signs of negligence or perhaps an error in judgment, although there is no indication that she knew of and disregarded an excessive risk to his health or safety. The facts really do not support an inference of deliberate indifference. Indeed, she told him to submit a sick call request if he had a problem with his work assignment.

The Court further notes that if P. A. Buchanan and Ms. Pace were ordered to respond to the lawsuit, then the claims against them would have to be dismissed for failure to exhaust. The law governing the exhaustion of administrative remedies is 42 U.S.C. § 1997e. In 1996, Congress enacted the Prison Litigation Reform Act, which mandated that no action shall be brought by a prisoner "until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The Supreme Court unanimously concluded that inmates must exhaust their administrative remedies before proceeding to federal court. *Booth v. Churner*, 532 U.S. 731 (2001). *See also Wright v. Hollingsworth*, 260 F.3d 357 (5th Cir. 2001). The Supreme Court subsequently held that exhaustion is mandatory and is required for all actions brought by prisoners. *Porter v. Nussle*, 534 U.S. 516, 524 (2002). More recently, the Supreme Court reiterated that exhaustion is mandatory and will not be excused when an inmate fails to timely exhaust his administrative remedies. *Woodford v. Ngo*, 126 S.Ct. 2378 (2006). However, the Supreme Court recently held that the failure to exhaust is an affirmative defense that must be pled by the Defendants. *Jones v. Bock*, 127 S.Ct. 910 (2007). The Court may not *sua sponte* dismiss claims against Buchanan or Pace for failure to exhaust, but a motion to dismiss filed by them for that reason would have to be granted. In any event, the Plaintiff's claims in this case should be dismissed on the merits, as opposed to his failure to exhaust his administrative remedies. It is accordingly

**ORDERED** that the complaint is **DISMISSED** with prejudice pursuant to 28 U.S.C. § 1915A(b)(1). The Plaintiff is free to file a lawsuit in state court for reasons explained in this opinion. It is finally

**ORDERED** that all motions not previously ruled on are **DENIED**.

So **ORDERED** and **SIGNED** this **14** day of **August, 2008.**

_____
JUDITH K. GUTHRIE
UNITED STATES MAGISTRATE JUDGE